## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-24-11-JFH |
| | ) | |
| CORD SIKES HUTCHINS and | ) | |
| DAVID COLBERT JOHNSTON, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Defendants Cord Sikes Hutchins and David Colbert Johnston are co-Defendants pursuant to an indictment charging one count each with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1), 924 (a)(8), & 2. Defendants have jointly moved to suppress all evidence obtained pursuant to the execution of an arrest warrant and subsequent search warrant, and the Court referred Defendants' motion for a hearing and for findings and recommendation pursuant to 28 U.S.C. § 636(b)(1). *See* Docket No. 53. The undersigned Magistrate judge conducted a suppression hearing on March 13, 2024. *See* Docket No. 59. For the reasons set forth below, the undersigned Magistrate Judge recommends that Defendants' Joint Motion to Suppress [Docket No. 39] be GRANTED IN PART and DENIED IN PART.

### Factual Summary

This case began when 53 firearms were stolen in Love County, Oklahoma. At least five of those stolen firearms were subsequently recovered in Wichita Falls, Texas, and law

enforcement officers from Texas contacted Love County Undersheriff Trent Daniel about the firearms. *See* Govt. Hr'g Exs. 1-6. Undersheriff Daniel, also part of the Eastern District of Oklahoma (EDOK) Violent Crimes and Fugitives Task Force run by the U.S. Marshals in this district, testified at the suppression hearing that Defendant Hutchins was part of an ongoing fugitive task force investigation arising from the aforementioned stolen weapons in that Hutchins had previously been arrested for harboring a fugitive in the stolen firearms case named Ryan Casey Wyatt. Following execution of a Texas search warrant for stolen firearms at a Texas residence where Hutchins was alleged to have rented a room, six stolen firearms were recovered (five from the Love County burglary and one from a Carter County, Oklahoma burglary). *Id.* A Wichita County Justice of the Peace Magistrate in Wichita County, Texas authorized six different arrest warrants as to Defendant Hutchins on April 28, 2023. *Id.* Undersheriff Daniel testified that the Eastern District of Oklahoma Task Force then "adopted" these six warrants based on the information in the warrants and Defendant Hutchins' criminal background, and he was assigned the warrants and began researching Defendant Hutchins' location.

Undersheriff Daniel testified that, to locate Hutchins, he interviewed Wyatt and at least two other unidentified individuals, who all stated Hutchins was living at 22720 State Highway 53, Springer, Oklahoma 73458. Undersheriff Daniel explained that Wyatt cannot read or write, so Wyatt described the Springer location by drawing a map in the gravel, including notable markers such as a cemetery, and explaining the location. Undersheriff Daniel testified that Wyatt had provided information before, which had been "100%

2

accurate." Additionally, Wyatt told Undersheriff Daniel that a yellow Ford pickup truck and two camper/trailers associated with Hutchins would be at the Springer residence. Undersheriff Daniel testified that he confirmed the location of the property via Google maps, and testified that he checked for Hutchins at a different address in Love County, Oklahoma (the "Gene Autry" address) where Hutchins was previously known to reside, but Hutchins was not there. Finally, he stated that he and other unidentified task force officers had driven by the property in the day or days leading up to Hutchins's arrest. His testimony was clear that he did not see a closed or locked gate prior to the day of arrest or on the day of arrest. He further testified that he did not see Hutchins or the yellow truck coming or going prior to the day of the arrest, but that he could see the yellow truck from the road. In response to questioning, Undersheriff Daniel testified that while he was not 100% certain Hutchins was there on the day they executed the search warrant, he was "overly confident" that Hutchins would be found on this property. For reasons that are relevant later, the undersigned Magistrate Judge finds that Undersheriff Daniel's testimony did not distinguish between whether Hutchins was living at the residence and whether he would be found at the residence at the time of the arrest.

On May 11, 2023, the day of Hutchins's arrest, eight EDOK task force officers (TFOs) gathered early in the day for a safety briefing on the arrest. The TFOs then convoyed to the Springer property, with emergency lights activated and a drone[1] flying

---

[1] Testimony at the suppression hearing revealed that the drone was not operated by a TFO but another agency and was providing a live feed that day. All officers who testified at the suppression hearing were unsure or unaware of any recording of this footage.

overhead, operated by the Oklahoma Bureau of Narcotics. None of the TFOs were wearing body cams, and none of their vehicles were equipped with dash cams. Deputy U.S. Marshal William Banks, the Task Force Supervisor, was in the lead vehicle, TFO Cody Vaughn was driving another vehicle roughly three vehicles back, and Undersheriff Daniel was in the second or third vehicle. Undersheriff Daniel testified that the drone operator communicated to them that he saw a man walk into the house before they arrived, although he could not recall if the operator identified the person as Hutchins or just a male. Undersheriff Daniel and DUSM Banks both testified that they did not remember a gate, although they did remember a cattle guard at the entrance close to the street, and that they did not have to stop to break a lock or open a gate to enter the property on May 11, 2023 (or in January 2024 when they arrested Hutchins and Johnston at this property pursuant to the indictment in this case). TFO Vaughn testified that he saw the gate but that it was open. DUSM Banks agreed upon questioning that the house was approximately a quarter of a mile back from the cattle guard entrance. Additionally, DUSM Banks testified that he did not leave a tort claim form for reimbursement of damaged property on May 11, 2023, which he would have if he had broken a lock, but that he did leave one in January 2024 when returning to arrest Defendants because a window was broken.

Shortly after 10:00 a.m. on May 11, 2023, the TFOs drove up to the house and surrounded it with their vehicles. Undersheriff Daniel was in a group of three or four led by DUSM Banks that went to the front door of the house. TFO Vaughn and two other TFOs were on a different side of the house handling two men, later identified as Defendant

4

Johnston and William Studeman. Before entering the house, TFOs also encountered a female on the property, who came from the direction of a camper/trailer. Undersheriff Daniel could not recall if they handcuffed her, but he testified that she did inform them Hutchins was in the house.

The group at the door began calling out for Defendant Hutchins to come out. Hutchins never came to the door, and TFO Vaughn used a radio from his position to confirm to DUSM Banks that Hutchins was inside, based on statements from Johnston and/or Studeman. The TFOs then opened the unlocked door of the house and began the search for Hutchins. In one of the bedrooms, TFOs found Hutchins lying on the bed, with an AR-15-style rifle with a magazine laying on the bed next to his right leg. Additionally, a handgun was on the bed with Hutchins somewhere near his head. Undersheriff Daniel, who stayed outside the door due to space constraints while DUSM Banks and another TFO went into the room, testified that the handgun was under a pillow, then later stated that it was in plain view. DUSM Banks, who was closer to Hutchins than TFO Vaughn, testified that the handgun was on the bed, obvious, and apparent. All officers agree the AR-15-style weapon was in plain view. TFOs instructed Hutchins to show his hands, which he did after a few seconds, and the TFOs arrested Hutchins without incident. DUSM Banks testified that Hutchins did not reach for either of the guns on the bed during this encounter, but simply stared at them from the bed before complying with the commands. DUSM Banks walked Hutchins outside and placed him in a law enforcement vehicle. Undersheriff Daniel testified that, after Hutchins was removed from the house, he and other TFOs

5

conducted a protective sweep of the house to make sure no other people remained and to preserve the house because TFO Banks planned to request a search warrant.

While DUSM Banks and Undersheriff Daniel handled Hutchins's arrest, TFO Vaughn was outside the residence with Johnston and Studeman. The Springer property was considered Johnston's residence, and Wyatt described him as the owner, although a records search has since revealed that Johnston's parents hold the title to the property. Prior to the execution of Hutchins's arrest warrants on May 11, 2023, Undersheriff Daniel testified that he did not know Johnston's name, as informants had described him only as "old man," nor did he know Studeman. TFO Vaughn testified that he and two other TFOs, all armed and wearing tactical vests, instructed the two men to walk away from the house and toward the officers with their hands up. TFO Vaughn described Johnston and Studeman as compliant with their instructions, although Johnston moved slower than Studeman. When the two walked out with their hands up, the TFOs handcuffed both men for safety purposes, according to TFO Vaughn.

TFO Vaughn says that he held his gun pointed down, toward their feet or the ground while questioning the two men. TFO Vaughn informed them that the officers were there to execute an arrest warrant against Hutchins. He began a series of questions and first asked if Hutchins was inside the house, which both men confirmed. As previously mentioned, TFO Vaughn conveyed the information he obtained to DUSM Banks over the radio in real time. Second, TFO Vaughn asked about guns in the house, and both confirmed guns were in the house and described them. Third, he asked if Johnston and Studeman

6

were convicted felons, which they confirmed they were.  Johnston also told Vaughn that the house was his and he lived there, and that Hutchins had also been living there for several months.   At the suppression hearing, TFO Vaughn testified that Johnston was not Mirandized and that his questions for Johnston and Studeman on that day were not made with an intention to arrest either of them.

DUSM Banks testified that after he placed Hutchins in his vehicle, he began completing the paperwork for a search warrant of the house while sitting in the vehicle. The search warrant describes the property by address and additionally contains an aerial photograph of the property, as well as a photograph of the front of the house.  DUSM Banks's affidavit states in support of probable cause that they had confirmed Hutchins's address through an interview (which DUSM Banks identified at the hearing as Wyatt's interview), and that they had confirmed that Hutchins and multiple firearms were in the house prior to entry.   Additionally, he noted the loaded AR-15-style rifle and loaded handgun that had been in plain view on the bed.  DUSM Banks identified Johnston as the "actual homeowner" of the Springer residence in his affidavit.  *See* Govt. Hr'g Ex. 7, p. 4, ¶¶ 8-9 & Ex. 8.  The Application and Search Warrant were granted that day and signed by U.S. Magistrate Judge Jason A. Robertson.  *See* Govt. Hr'g Exs. 7-8.  TFOs found other firearms and ammunition in addition to the two loaded firearms seen in plain view on Hutchins's bed during his arrest. DUSM Banks took photos while other TFOs searched, and his photos include:  (1) a picture of a social security card for Hutchins, found in the room where he was arrested, with a Wichita Falls address on the back; (2) the two loaded

7

firearms in Hutchins's room, along with ammunition; and (3) a bolt action rifle found in the living/common area. *See* Govt. Hr'g Exs. 9-12. Undersheriff Daniel testified that a search of the yellow pickup truck revealed two AR-15 magazines taped together and a headstone with Hutchins's name on it, including a birthdate but no death date.

## ANALYSIS

The Fourth Amendment provides:

> The right of the people to be secure in their . . . houses . . ., against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

### **<u>Defendant Hutchins</u>**

"[T]he Supreme Court, in two cases decided a year apart, laid out the rules law enforcement must observe in making arrests in a home." *United States v. Thompson*, 402 Fed. Appx. 378, 382 (10th Cir. 2010) (citing *Steagald v. United States,* 451 U.S. 204 (1981)); *Payton v. New York,* 445 U.S. 573 (1980). Under *Steagald*, "[a]bsent exigent circumstances or consent, the police cannot lawfully search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant. *Id.* (citing *Steagald*, 451 U.S. at 205-206). Under *Payton*, "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton*, 445 U.S. at 603. As a result, we have "a two-prong test for determining whether an arrest warrant alone is

8

sufficient to justify entrance into a home. For their entrance to be lawful, officers must have a reasonable belief the arrestee (1) lives in the residence and (2) is within the residence at the time of entry." *Thompson*, 402 Fed. Appx. at 382 (citing *United States v. Gay,* 240 F.3d 1222, 1226 (10th Cir. 2001) (citing *Valdez v. McPheters,* 172 F.3d 1220, 1224-1225 (10th Cir. 1999)). "[W]hether *Steagald* or *Payton* applies is resolved under the first prong of the *Payton* test." *Gay*, 240 F.3d at 1226.

*Prong 1: Reasonable Belief Hutchins Resides at Residence.* First, the TFOs must have reasonably believed that Hutchins lived at the Springer residence at the time of entry. *Id.* This reasonable belief does not have to be "true in fact" so long as, under the totality of the circumstances, the "belief was objectively reasonable at the time of entry. *Valdez*, 172 F.3d at 1225 ("In the real world, people do not live in individual, separate, hermetically-sealed residences. They live with other people, they move from one residence to another. Requiring that the suspect actually reside at the residence entered would mean that officers could never rely on *Payton,* since they could never be certain that the suspect had not moved out the previous day and that a *Bivens* or a 42 USC § 1983 claim would then be made against them by another resident."). This rule in *Payton* therefore applies "so long as the suspect possesses common authority over, or some other significant relationship to, the residence entered by police." *Id.* (quotation omitted).

A "reasonable belief" is a different standard from the "reasonable suspicion" required for a "stop and frisk" under *Terry v. Ohio*, 392 U.S. 1 (1968). *Gay*, 240 F.3d at 1227. Although the reasonable belief cannot be based on information gleaned from an

unknown confidential informant, *see id.*, the TFO officers here relied on more than that. Undersheriff Daniel personally interviewed Wyatt, who knew Hutchins was involved in criminal activity, described the location of the residence to the best of his ability based on his personal knowledge, and further described a vehicle that would be seen there. Undersheriff Daniel had been to the residence and observed the previously-described yellow pickup truck a day or two before. Additionally, he had checked the "Gene Autry" residence to see if Hutchins was there, and he was not. Even without accounting for the interviews with unidentified individuals that Undersheriff Daniel cited to corroborate Wyatt's statements, the undersigned Magistrate Judge has no trouble concluding that the TFOs possessed a reasonable belief that Hutchins lived at, or at least possessed some common authority over, the Springer residence at the time they went to execute the search warrant. *Thompson*, 402 Fed. Appx. at 383 ("[I]f the officers reasonably believe the suspect possesses common authority over, or some other significant relationship to, the residence, then this prong is satisfied."). This reasonable belief can exist even if there is evidence that a suspect lives in more than one dwelling. *Id.* at 384 ("*Payton* does not void as 'unreasonable' an officer's belief that a suspect lives in a given dwelling merely because that suspect also 'lives' in another. Here, although police may have reasonably believed Thompson lived at 2213 N. Kelham, it was also reasonable for them to believe he lived at 4619 Creek Court."). Defendant attempted to establish that his residence was not the Springer property by showing the Texas address on Hutchins's Social Security card and by reference to the "Gene Autry" address. At a minimum, evidence is sufficient to find

Hutchins could have lived in more than one of these residences, *including* the Springer property, or at least recently moved to the Springer property.

This standard likewise applies for a shared residence, such as here with Johnston and Hutchins. *Id.* at 385 ("Given the totality of the information, it was reasonable for the officers to believe the residence was shared by Thompson (the suspect) and Ms. Harris (a third party). Thus, on these facts, *Payton* not *Steagald* applies.") (citing *United States v. Litteral,* 910 F.2d 547, 553 (9th Cir.1990) ("if the suspect is a co-resident of the third party, then *Steagald* does not apply[.]")). It was reasonable for the officers to believe the residence was shared. Accordingly, the TFOs possessed a reasonable belief that Hutchins lived at the Springer property, satisfying the first *Payton* prong.

Importantly, "[o]ne consideration which is not relevant to this determination involves information gained after the entry." *Valdez*, 172 F.3d at 1226 n.3. That Defendant was also found at the Springer residence when he was arrested in January 2024 and that Defendant agrees now that he lived there, are irrelevant. This also applies to the address on the Social Security card. *See id.* ("Since this information was not known to the defendants at the time of the entry into the Valdez residence, it cannot retroactively justify the defendants' conduct."); *see also Gay*, 240 F.3d at 1227 n.5 ("Although Mr. Gay admitted he lived at the Pottinger Street residence for approximately two months prior to arrest, we will not consider the admission in our examination of the arresting officers' reasonable belief because it was acquired after entry into the duplex.") (citing *Valdez,* 172 F.3d at 1226 n.3).

11

*Entry of Springer Property at Cattle Guard.* Implicit in many arguments raised here by both Defendants is that the EDOK Task Force entry onto the Springer property was accomplished only after one of the TFOs used bolt cutters to cut a lock and open a gate over the cattle guard at the entrance near the street, which they contend was the first and original violation of Defendants' Fourth Amendment rights. Both Defendants assert the Task Force unlawfully entered the premises and therefore unlawfully entered the curtilage of the property as well.

Hutchins's attorney introduced two photos at the suppression hearing. Dfdt. Hutchins Hr'g Exs. 2, 8. The first appears to be the entrance to the Springer property, with a gate in the foreground, closed and locked with a chain. *Id.* Ex. 2. The second is a close-up of the chain and lock on the gate. *Id.* Ex. 8. Counsel represented that she took these photos in January 2024 after she was appointed to represent Defendant Hutchins, and she spent considerable time at the hearing attempting to establish that the gate was closed and locked on May 11, 2023. Undersheriff Daniel testified that he never saw a gate or a lock and that he did not recall the Task Force convoy stopping at the entrance of the property to open/break a locked gate. TFO Vaughn testified that he drove the second car, did not see a locked gate, did not recall slowing down for one, and did not see any officer in the first vehicle get out to retrieve bolt cutters. DUSM Banks likewise testified that he was in the first vehicle and there was no gate. When pressed by Counsel, he even "promised" that there was not a chain, a lock, or anything like that. Additionally, he testified that when he drove by the residence earlier in the day on May 11, 2023, there was no gate across the

12

cattle guard.  Upon looking at Exhibit 8, DUSM Banks agreed that the gate looked old, but he and the other two officers who testified all indicated that they had never seen the gate as depicted in Exhibit 2.

At the suppression hearing, Defendant Johnston testified that the property has been in his family since statehood, and that the gate had been there since 1999.  However, as the Government pointed out during argument, Johnston did not testify that the gate was closed and locked on May 11, 2023, only that it had been there since 1999.  Again, while DUSM Banks agreed that the gate looked old, neither he nor any of the other officers who testified recalled a closed gate or the need to break a lock to enter the property.

Although extensive time was devoted to the gate at the suppression hearing, the argument as to the gate is another way of stating the *Steagald/Payton* question.  The Task Force officers would have needed a search warrant or exigent circumstances as required in *Steagald* to break the gate to enter the Springer residence _only_ if Hutchins did not live there. *Steagald*, 451 U.S. at 216 ("[W]arrantless searches of a home are impermissible absent consent or exigent circumstances[.]").  Because Hutchins did live there, however, the *Payton* analysis controls.  As discussed above, officers had a reasonable belief that Hutchins lived there.  When officers arrived at the cattle guard at the Springer residence, however, they had not yet established a reasonable belief that Hutchins was inside *at that time* as required under *Payton*'s second prong, discussed further below.  Had there been any evidence that the gate was closed and locked, this may have presented a more significant question for the Court.  Under the evidence here, though, the undersigned

Magistrate Judge cannot find that the cattle guard gate was closed or locked and therefore need only consider the two prongs of *Payton* as demonstrated by the evidence before the Court. The evidence here shows that the officers drove onto the property via the driveway and surrounded the house with their vehicles, which were outside a smaller chain link fence near the house. *See* Govt. Hr'g Ex. 7, p. 7. Even if officers opened the gate at the chain link fence to take the path to the front door, they were within the curtilage of the home but not violating the Fourth Amendment because they were in a normal access route for anyone visiting the premises. *See, e.g.*, *United States v. Shuck*, 713 F.3d 563, 567 (10th Cir. 2013) ("Even assuming the area traversed by the officers was within the curtilage, the officers would not have violated the Fourth Amendment by walking up to the back door and knocking, as they did here. . . . [even t]he portion of the curtilage that is the normal route of access for anyone visiting the premises is only a semi-private area on which police may set foot if they restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches).") (quotations omitted). Because there is no evidence to support Defendants' argument that the cattle guard gate was closed and locked on May 11, 2023, the officers' entrance onto the property was permissible under *Payton*.

*Prong 2: Reasonable Belief That Hutchins was Within the Residence at the Time of Entry.* The second prong is supported by "common-sense factors," meaning that direct surveillance confirming a suspect is within the residence at the time of entry is not required. *Gay*, 240 F.3d at 1227 ("The officers are not required to actually view the suspect on the premises.") (citing *Valdez*, 172 F.3d at 1226). The presence of the suspect/Defendant can

14

be suggested by:

> the presence of an automobile, the time of day, observing the operation of lights or other electrical devices, and the circumstances of a suspect's employment. And the officers may consider an absence of evidence the suspect is elsewhere. No single factor is, of course, dispositive. Rather, the court must look at all of the circumstances present in the case to determine whether the officers entering the residence had a reasonable belief that the suspect resided there and would be found within.

*United States v. Carter*, 2013 WL 6858513, at *3 (D. Kan. Dec. 30, 2013) (citing *Valdez*, 172 F.3d at 1226 (citations omitted)); *see also United States v. Maley*, 2020 WL 1041545, at *7 (D.N.M. Mar. 3, 2020) (collecting cases). "Indeed, the officers may take into account the fact that a person involved in criminal activity may be attempting to conceal his whereabouts." *Valdez*, 172 F.3d at 1226. Additionally, "officers may consider an absence of evidence the suspect is elsewhere." *Id.* (citation omitted).

In this case, the TFOs had evidence Hutchins was staying at the Springer residence, based on Wyatt's information and other interviews. They had information he was driving a yellow pickup truck, which was observed at the residence prior to and on the day of the arrest. Additionally, he was not found at the "Gene Autry" residence. Most importantly, however, the TFOs confirmed with all three individuals outside the residence that Hutchins was inside before they opened the door to find him inside. *See Thompson*, 402 Fed. Appx. at 386 (Where officers had information Defendant was living at the residence, his vehicle was observed prior to and upon arrival to execute the search warrant, it was executed at a time when residents are typically home, and the women who answered the door appeared to indicate Defendant was inside, the second prong was satisfied). Although not

sufficiently established until the TFOs were at the door of the residence and TFO Vaughn radioed confirmation that Hutchins was inside and/or the woman outside confirmed that information to the men at the door, the undersigned Magistrate Judge finds that the TFOs possessed a reasonable belief Hutchins was inside at the time they entered the house.

Accordingly, the undersigned Magistrate Judge finds that the entry of the Springer residence to arrest Hutchins did not violate his Fourth Amendment rights, and the motion to suppress should be denied as to Hutchins's arrest.

*Weapons in Plain View*.  Because Hutchins's arrest did not violate the Fourth Amendment, the seizure of the two weapons in plain view here was authorized.  The "plain view" doctrine is a valid exception to the warrant requirement where, as here, "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed."  *See Horton v. California*, 496 U.S. 128, 133-134, 136 (1990) ("If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy.") (citations omitted).  "'A warrantless seizure of evidence is sustainable if (1) the police officer was lawfully located in a place from which to plainly view the item; (2) the officer had a lawful right of access to the item; and (3) it was immediately apparent that the seized item was incriminating on its face.'" *United States v. Muhtorov*, 20 F.4th 558, 597 (10th Cir. 2021) (quoting *United States v. Castorena-Jaime*, 285 F.3d 916, 924 (10th Cir. 2002)).  Because all three elements are met here, the incriminating evidence observed by the officers in plain view in Hutchins's room was thus legally obtained.

**Defendant Johnston**

Defendant Johnson contends TFO Vaughn and the other two TFOs unreasonably detained him outside his house. The Fourth Amendment prohibits all *unreasonable* searches and seizures. *See* U.S. Const. Amend. IV. The Tenth Circuit holds that *Maryland v. Buie*, 494 U.S. 325 (1990), which sets forth the criteria for analyzing protective sweeps, applies to both protective searches and protective detentions such as occurred with Johnston. "*Buie's* two sets of evaluative criteria—one for when the search is immediately adjoining the place of arrest and one for when the search is located in the broader area of the arrest scene—apply to protective detentions as well." *United States v. Maddox*, 388 F.3d 1356, 1362 (10th Cir. 2004).[2] Because Johnston was not in the area immediately adjoining the bedroom where Hutchins was arrested, the latter applies. *See United States v. Kinzalow*, 236 Fed. Appx. 414, 418 (10th Cir. 2007) ("Where an individual is in an area immediately adjoining the arrestee, the individual may be placed in temporary protective detention even in the absence of probable cause or a reasonable suspicion that the individual poses a threat to officer safety. On the other hand, where an individual is on the arrest scene but is not in an area immediately adjoining the arrestee, the individual may only be detained where officers possess a reasonable suspicion that the individual poses a danger.") (citation omitted). Under those circumstances, "law enforcement officers may only detain individuals on the scene of the arrest who are not within the "immediately

---

[2] The Government cites to *Buie* and *Maddox* in the Response Brief, but fails to apply the evaluative criteria therein. *See* Docket No. 49, pp. 8-12.

adjoining" area of the arrest if the officers "possess a reasonable belief based on specific and articulable facts[,]" that the individual poses a danger to them." *Maddox*, 388 F.3d at 1363 & n.3 ("[W]e find the inclusion of the area immediately outside of the Buhrle residence as part of the arrest scene reasonable, in large part, because of the isolated and dangerous nature of the residence. In many other settings—for instance, a crowded urban area or an apartment complex—the arrest scene might properly be drawn much more narrowly.") (quoting *Buie*, 494 U.S. at 337).

In evaluating whether the Task Force Officers had a reasonable and articulable suspicion to justify the detention of Johnston, the Court looks at the totality of the circumstances, which requires balancing Johnston's Fourth Amendment interests against the TFO officers' interest in safety. *Maddox*, 388 F.3d at 1365. A protective detention is "decidedly not automati[c], but may be conducted only when justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 336 (quotation omitted). "[E]ven if one factor would be insufficient standing alone, it may be considered as one of the many factors in determining the reasonableness of [an officer's] conduct." *Maddox*, 388 F.3d at 1366. Additionally, "as a part of our reasonableness analysis[] not only must the seizure be justified at its inception, but []the scope of seizure employed must also be reasonable under the circumstances." *Maddox*, 388 F.3d at 1367. Any "protective detention must be 'no more than necessary to protect the officer[s] from harm[,]' 'tak[ing only] reasonable steps to ensure their safety after, and while making, the arrest.' Finally, the protective detention

18

should 'last[ ] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.'" *Maddox*, 388 F.3d at 1367-1368 (quoting *Buie*, 494 U.S. 333, 334, 335-336). The Court in *Maddox* identified the following factors demonstrating a reasonable suspicion of danger:

> (i) the arrest was of a narcotics trafficker, and such arrests are known to be highly dangerous; (ii) the home in question was known to be a dangerous location, as officers had previously investigated a murder at that address and a number of violent fugitives had been arrested there; (iii) it was getting dark; (iv) the officer was outnumbered five-to-one, and one of the individuals was a known murder suspect; and (v) the officer had observed Maddox reach under the seat of his car when he arrived, possibly retrieving a weapon.

*Smith v. Kenny*, 678 F. Supp. 2d 1124, 1169-1170 (D.N.M. 2009). Additionally, in *Maddox*, the officer "did not initially handcuff Mr. Maddox, draw his weapon, or treat him with indignity." *Maddox*, 388 F.3d at 1367.

TFO Vaughn cited officer safety[3] as the reason he handcuffed Johnston and Studeman almost immediately. TFO Vaughn and the other two TFOs were assisting in the arrest of a convicted felon, Hutchins, who was accused of stealing firearms that had not all been recovered and also had a history that included domestic violence charges. It is apparent that this was an inherently dangerous activity. However, Undersheriff Daniel testified that he had not identified Johnston beyond the term "old man," and none of the TFOs apparently knew Johnston or Studeman at the time of their approach, nor did they

---

[3] The officers' community caretaking function is not implicated here. *See, e.g.*, *United States v. Neugin*, 958 F.3d 924, 930-931 (10th Cir. 2020) ("The community-caretaking exception allows the government to introduce evidence obtained through searches that are 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'") (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)).

see either of them engaged in suspicious activity. TFO Vaughn testified specifically that he handcuffed Johnston for officer safety, and that he did not consider Johnston a suspect. Further, all officers had drawn their weapons (although they pointed them to the ground after Johnston complied). None of the testimony or briefing addressed whether the property was in a dangerous location, but the pictures and Google aerial view demonstrate that it is in a rural area, and one of the officers testified that there were no neighbors to even ask if Hutchins lived there.

"Use of weapons . . . is justified 'where the police reasonably believe the[y . . .] are necessary for [officers'] protection,' where, for example, there was 'at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time.'" *Ramirez v. Reddish*, 2020 WL 1955366, at *16 (D. Utah Apr. 23, 2020) (quoting *Lundstrom v. Romero*, 616 F.3d 1108, 1121 (10th Cir. 2010) (quoting *United States v. Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002)); *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010)). While a limited seizure of the men and the use of weapons for protection may well have been justified at the inception in light of the risk of injury or danger to the TFOs, the undersigned Magistrate Judge finds the scope was beyond what was necessary under the circumstances. *See, e.g.*, *Kenny*, 678 F. Supp. 2d at 1169-1170 ("Similar to the circumstances in *United States v. Maddox,* in this case, the potential arrest was of a murder suspect, and therefore was likely dangerous, and it was dark. On the other hand, many circumstances are distinguishable: (i) there is no evidence that 1704 Cardenas is in a particularly bad section of town or was particularly dangerous; (ii) the officers had the

advantage, outnumbering L. Smith and M. Smith approximately five-to-one; and (iii) the officers had no basis to believe that L. Smith or M. Smith were armed."); *Otero v. Longhi*, 2013 WL 12330030, at *4 (D.N.M. May 13, 2013) ("Defendants were not outnumbered— the two officers were faced with either Plaintiff, who is disabled, alone, or Plaintiff and his elderly mother.  Defendants did not see Plaintiff engage in suspicious behavior prior to the stop and they were aware that another home, for which they did not have a warrant, shared the driveway.  Thus, none of the additional circumstances that justified the detention in *Maddox* exist here based on the facts alleged in Plaintiff's complaint."); *People v. Tate*, 853 N.E.2d 1249, 1258 (2006) ("In the case at hand, defendant was pulled out of the car, placed on the ground, and handcuffed before being questioned by the police. Even if the seizure here had been warranted, under the reasoning of *Maddox,* the scope was beyond what was necessary under the circumstances.").

The arrest of Hutchins was clearly highly dangerous, as TFOs were attempting to arrest a known felon accused of stealing firearms that had not all been recovered.  However, the home was not a dangerous location, but isolated, and the arrest was made mid-morning. Finally, the TFOs outnumbered the individuals on the property and TFO Vaughn specifically testified that he had no suspicion or specific concern with regard to Johnston and Studeman other than officer safety but that he still handcuffed both men.  Under the totality of the circumstances, Johnston's seizure was not therefore justified in scope, and Johnston's statements as to himself should be suppressed.  *United States v. Revels*, 510 F.3d 1269, 1273 (10th Cir. 2007) ("*Miranda* thus established a two-part analysis for

determining when the prescribed procedural safeguards must be provided: (1) the individual must be in custody, and (2) the individual must be subjected to questioning that meets the legal definition of interrogation.") (citing *United States v. Perdue,* 8 F.3d 1455, 1463 (10th Cir. 1993) ("The Court has explained that interrogation includes 'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'") (quoting *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980) (footnotes omitted)); *see also United States v. McGreevy*, 2015 WL 4876819, at *3 (D. Kan. Aug. 14, 2015) "(The 'fruit of the poisonous tree' doctrine further requires suppression of evidence indirectly obtained through 'exploitation of [the] illegality' of an unconstitutional search or seizure.") (quoting *Wong Sun v. United States,* 371 U.S. 471, 484 (1963)); *accord* U.S. CONST. amend IV.

"We adhere to these cases and to the general rule that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969). TFO Vaughn testified that he asked three questions of Johnston: (1) whether Hutchins was in the house, (2) whether there were guns in the house, and (3) whether he was a convicted felon. Only Johnston's answers to questions 2 and 3 should be suppressed as to Defendant Johnston only (and not as to Defendant Hutchins), as the first question does not implicate Johnston's Fourth Amendment rights and none of the questions to Johnston implicate Hutchins's rights. Additionally, any statement Johnston made as to ownership of the house should be suppressed as to Johnston, in the event it could be used against him. Also notable here is

that Studeman's statements are not subject to suppression as to either Defendant, and his statements, other than ownership of the property, mirrored Johnston's. *See United States v. Rodriguez-Pando*, 841 F.2d 1014, 1017 (10th Cir. 1988) ("'[D]efendants . . . may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have . . . been violated.'") (quoting *United States v. Salvucci,* 448 U.S. 83, 85 (1980)).

**Search Warrant**

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. In other words, the Fourth Amendment requires that: "[i] a warrant must be supported by probable cause, and [ii] it must describe with particularity the place to be searched, and the persons or things to be seized." *United States v. Russian*, 848 F.3d 1239, 1244 (10th Cir. 2017) (quotation omitted). The determination this Court must make is whether "the issuing magistrate had a substantial basis for concluding that probable cause existed." *United States v. Corral*, 970 F.2d 719, 726 (10th Cir. 1992) (citations omitted). In this regard, affidavits submitted in support of a probable cause determination are to be judged by the "totality of the circumstances" standard outlined by the Supreme Court in *Illinois v. Gates*, 462 U.S. 213, 235 (1983).

"Fourth Amendment jurisprudence teaches that a warrant remains valid only as long as the information in the oath or affirmation supporting its issuance provides probable cause to believe the items sought will still be found in the place to be searched at the time

the search is conducted." *United States v. Garcia*, 707 F.3d 1190, 1194 (10th Cir. 2013) (citing *United States v. Shomo*, 786 F.2d 981, 983 (10th Cir. 1986)). "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched." *United States v. Corral–Corral*, 899 F.2d 927, 937 (10th Cir. 1990) (citing *United States v. McCoy*, 781 F.2d 168, 172 (10th Cir. 1985)).

Defendants argue that the subsequently authorized search warrant of the Springer property was issued in violation of *Franks v. Delaware*, 438 U.S. 154 (1978) because DUSM Banks omitted relevant information to the issuing judge. Defendants were afforded a *Franks* hearing simultaneously with the suppression hearing. "Under *Franks*, a Fourth Amendment violation occurs if '(1) an officer's affidavit supporting a search warrant application contains a reckless misstatement or omission that (2) is material because, but for it, the warrant could not have lawfully issued.' Thus in order to obtain any sort of relief under *Franks*, a defendant must show both recklessness and materiality." *United States v. Moses*, 965 F.3d 1106, 1110-1111 (10th Cir. 2020) ("[F]ailure to show either materiality or recklessness is fatal to a defendant's entitlement to a *Franks* hearing.") (quoting *United States v. Herrera*, 782 F.3d 571, 573 (10th Cir. 2015)). "[T]o receive a *Franks* hearing and an opportunity to present these challenges a defendant must first make 'a substantial preliminary showing' that he or she can meet this standard. This preliminary showing must include an offer of proof, and the defendant must provide supporting affidavits or satisfactorily explain their absence." *United States v. Garrison*, 761 Fed. Appx. 808, 811 (10th Cir. 2019) (quoting *Franks*, 438 U.S. at 155-156, 171-172). It is the Defendant's

burden to establish this based on a preponderance of the evidence. *Id.* Defendants contend that the relevant *omitted* information was the breach of the locked gate. The arguments as to the locked gate, discussed at length *supra*, will not be restated here. Because the undersigned Magistrate Judge has no trouble concluding that there was no evidence the gate was closed or locked, Defendants' argument fails here as well.

    *Protective Sweep.* Importantly, Undersheriff Daniel testified that, after Hutchins was removed from the residence, he and other TFOs conducted a protective sweep of the house to make sure no other individuals remained and in an effort to preserve the scene for the anticipated search warrant. Neither he nor DUSM Banks indicated through their testimony that incriminating evidence was seen in plain view and DUSM Banks's affidavit made no mention of the sweep nor a reference to any observed evidence in plain view that arose from it. While "officers can search beyond adjacent areas upon 'specific and articulable facts' supporting an objective belief that someone dangerous remains in the house," *United States v. Bagley*, 877 F.3d 1151, 1156 (10th Cir. 2017) (quoting *Buie*, 494 U.S. at 332-334) (quoting *Terry*, 392 U.S. at 21)), "lack of knowledge cannot constitute the specific, articulable facts required by *Buie*." *Id.* (citing *United States v. Nelson*, 868 F.3d 885, 889 (10th Cir. 2017)). While suppression may have been required had the search warrant included evidence found in the protective sweep, that is not the case here. *Id.* (suppression is required and the good faith exception is not applicable where the "search warrant was based solely on what the deputy marshals had found in the improper protective sweep.").

*Ownership of the Property*.  "In addressing the materiality of [any] omitted information, we look to see whether a warrant would issue in a 'but-for world where the attesting officer faithfully represented the facts.'  We make this assessment by '(1) removing any false information from the affidavit, (2) including any omitted material information, and then (3) inquiring whether the modified affidavit establishes [or negates] probable cause for the warrant.'" *Kapinski v. City of Albuquerque*, 964 F.3d 900, 905 (10th Cir. 2020) (quoting *Herrera*, 782 F.3d at 575 and *Puller v. Baca*, 781 F.3d 1190, 1197 (10th Cir. 2015)).  At the hearing, Defendants established that Johnston's parents, rather than Johnston, are the actual owners of record of the Springer property while Johnston has been the primary resident.  The ownership of the residence, however, does not negate a finding of probable cause in this case.  Defendants appear to suggest that DUSM Banks should have run a property search to determine the true owner, but here he had no reason to doubt Johnston's own statements.  *Id.* at 908 ("To establish recklessness, 'there must exist evidence that the officer in fact entertained serious doubts as to the truth of his allegations.'") (quoting *Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014)).  Moreover, the identity of the owner(s) of the property in question does not negate probable cause here.

*Johnston's Statements*.  Additionally, Defendants assert the search warrant was "fruit of the poisonous tree" because it was based on evidence obtained during officers' entry of the property and the seizure and interrogation of Johnston.  Defendants contend exclusion is the only remedy.  As relevant here, DUSM Banks indicated in his affidavit for

the search warrant that they had confirmed through an interview, which he testified was the interview of Wyatt, that Hutchins lived at the Springer residence and that they had determined that Hutchins was in the residence at that time based on Johnston and Studeman's statements. Additionally, he noted that Johnston and Studeman both told him that there were multiple firearms in the house, and that the AR-style rifle and handgun had been found in plain view. Finally, he stated in the affidavit that Johnston was the homeowner of the residence, and that Johnston stated both he and Studeman were convicted felons. *See* Govt. Hr'g Ex. 7, p. 4, ¶¶ 8-9. DUSM Banks stated, "Based upon the statements of Johnston and Studeman, I believe that there are additional firearms located inside the residence." *Id.*, ¶ 10.

Johnston's statements implicate questions related to both the Fourth and Fifth Amendments. Should the statements be fruit of an illegal seizure, they would be fruit of the poisonous tree under *Wong Sun*. *See, e.g.*, *United States v. Villa-Gonzalez*, 623 F.3d 526, 535 (8th Cir. 2010) (both a Fourth and Fifth Amendment violation occurred where officers entered residence without a warrant and Defendant made incriminating statements). Here, the undersigned Magistrate Judge found that the seizure of Johnston was not illegal, only the scope of the seizure and subsequent questioning (as to Defendant Johnston only). The "police do not violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*. Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial." *United States v. Patane*, 542

U.S. 630, 641 (2004). Accordingly, "physical evidence [obtained pursuant to a search warrant] that is the fruit of a voluntary statement should not be suppressed even if the statement was elicited without a *Miranda* warning." *United States v. Phillips*, 468 F.3d 1264, 1266 (10th Cir. 2006) (citing *Patane* 542 U.S. at 634 ("[T]he Self–Incrimination Clause . . . is not implicated by the introduction at trial of physical evidence resulting from voluntary statements. . . ."); *id.* at 645 (Kennedy, J., concurring) ("Admission of nontestimonial physical fruits . . . does not run the risk of admitting into trial an accused's coerced incriminating statements against himself."); *United States v. Pettigrew,* 468 F.3d 626, 635 (10th Cir. 2006) ("[T]he prosecution may still introduce physical evidence seized as a result of a *Miranda* violation.").

TFO Vaughn testified that while he was armed and wearing a tactical vest when he questioned Johnston and Studeman and they were not free to leave, his questions were asked without any intention to arrest Johnston (or Studeman) and they did not separate the men. Johnston contends that his statements were not voluntarily given, although it is not clear from TFO Vaughn's testimony that the statements themselves were coerced. While they were clearly in custody and not free to leave, TFO Vaughn testified that he was asking questions for information purposes, not for accusatory purposes. "We consider the following factors in determining voluntariness: (1) the age, intelligence, and education of the defendant; (2) the length of [any] detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of [his or] her constitutional rights; and (5) whether the defendant was subjected to physical punishment." *United States v. Cordova*, 340 Fed.

Appx. 427, 433-434 (10th Cir. 2009) (citing *United States v. Rith*, 164 F.3d 1323, 1333 (10th Cir. 1999)). Although Johnston was not advised of his rights, he was not subject to physical punishment, he was of age and has experience with the legal system. While the length of detention is unclear, it appears to have only lasted the time it took to place Hutchins in custody, and the questioning was largely limited and directed toward Hutchins and the house and accomplished within minutes of the TFOs encountering the two men. Johnston and Studeman did not remain in custody that day, and Johnston was not arrested until January 2024. TFO Vaughn testified that even the question as to any previous felony convictions was asked for safety and truthfulness purposes rather than incriminating purposes. While the men were clearly in a police-dominated atmosphere and their movements were limited, Defendants were not the target of a coercive interrogation with the object of obtaining incriminating evidence relevant to Johnston and Studeman. Because Johnston's statements were not coerced, the evidence seized pursuant to the search warrant should therefore not be suppressed.

Even if Johnston's statements were coerced, however, the undersigned Magistrate Judge finds that the remaining lawfully-obtained information in the search warrant, separate from Johnston's statements, supports the probable cause for the search warrant. *Thomas v. Langford*, 2023 WL 4076772, at *5 (D. Kan. June 20, 2023) ("[I]f the lawfully obtained information is sufficient, standing alone, to support the requisite probable cause to issue a warrant, the existence of any unlawfully obtained information will not invalidate the warrant."); *see also State v. Fisher*, 154 P.3d 455, 477 (Kan. 2007) ("'Assuming the

application and affidavit for the search warrant contained information both lawfully and unlawfully obtained, the question remains whether the lawfully obtained information by itself supports probable cause that would have justified issuance of the search warrant by the magistrate.'") *(quoting State v. Weas*, 992 P.2d 221, 225 (Kan. App. (1999))*.*  Even eliminating Johnston's statements as to himself and the guns in the house, Studeman[4] made the same uncoerced statement that Hutchins was in the house along with multiple firearms and the search warrant therefore remains supported by probable cause.  Evidence derived from the search warrant should therefore not be suppressed.

## Conclusion

In summary, the undersigned Magistrate Judge finds that the EDOK Task Force entry onto the Springer property was authorized pursuant to a valid arrest warrant for Defendant Hutchins, as well as the entry of the home to arrest Hutchins and the seizure of the two weapons in plain view.  However, Defendant Johnston's statements as to ownership of the house, that there were guns in the house where he lived, and that he is a convicted felon, should be suppressed as to Johnston only.  Finally, the search warrant at issue in this case was supported by probable cause and the evidence seized from the search of the Springer property should therefore NOT be suppressed.  Accordingly, the undersigned hereby PROPOSES the findings set forth above and RECOMMENDS that the Defendants' Joint Motion to Suppress [Docket No. 39] be GRANTED IN PART as to the above-

---

[4] Again, "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman*, 394 U.S. at 174.

described statements by Johnston as to Johnston only, but otherwise DENIED.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Criminal Procedure 59(b)(2), a party may file specific written objections to the Magistrate Judge's report and recommendations. The exigencies of the Court's calendar amid the ongoing *McGirt* crisis, and the need to maintain the trial date in this matter, require the Court to shorten the window for filing objections to seven (7) days with an additional seven (7) days for responses. *See United States v. Barney*, 568 F.2d 134, 136 (9th Cir. 1978); *Sabal Trail Transmission, LLC. v. 7.72 Acres in Lee Cnty., Ala.*, 2016 WL 10789585, at *1 (M.D. Ala. June 6, 2016) (collecting cases).[5] Any objections must be filed on or before Monday, April 1, 2024.

If specific written objections are timely filed, Fed. R. Crim. P. 59(b)(3) directs the district judge to:

> consider de novo any objection to the magistrate judge's recommendation. The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions.

---

[5] Specifically, the Northern and Eastern Districts of Oklahoma have unprecedented caseloads and jurisdictional complexities since the Supreme Court's decision in *McGirt v. Oklahoma*, 591 U.S. __, 140 S. Ct. 2452 (2020). *McGirt* caused an immediate increase of nearly 200% in the number of criminal cases filed in the Northern District and more than 400% in the Eastern District. *See* U.S. Courts, *Judiciary Supplements Judgeship Request, Prioritizes Courthouse Projects* (Sept. 28, 2021), https://www.uscourts.gov/news/2021/09/28/judiciary-supplements-judgeship-request-prioritizes-courthouse-projects. This extraordinary number of criminal cases thrust into federal court, virtually overnight, is unlike anything ever seen in this Country's history. Indeed, the Supreme Court has since recognized the "significant challenge for the Federal Government and for the people of Oklahoma" in the wake of *McGirt*. *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 635 (2022). Numerous federal courts have "noted *McGirt*'s tremendous impact." *United States v. Budder*, 601 F. Supp. 3d 1105, 1114 (E.D. Okla. 2022) (collecting cases), *aff'd* 76 F.4th 1007 (10th Cir. 2023).

Fed. R. Crim. P. 59(b)(3); see also 28 U.S.C. § 636(b)(1).  Failure to timely object waives

a party's right to appellate review.  *See United States v. Goebel*, 959 F.3d 1259, 1266 (10th

Cir. 2020).

       IT IS SO ORDERED this 25th day of March, 2024.

_____

**GERALD L. JACKSON**
**UNITED STATES MAGISTRATE JUDGE**